11833, Cheryl Barnes, this is Jose Alvarado, Monarrez You guys can come and take these seats if you want to sit down. Yeah, I think there should be sufficient seat. I would like to introduce myself. Good morning, your honors. Helen Witt on behalf of the defendant appellant, Jose Eduardo Monarrez. Richard Grossman on behalf of the appellee, Cheryl Barnes. Let's proceed. Thank you, your honors. I would like to reserve three minutes for rebuttal. I, too, would like to concentrate my arguments this morning on one of the issues that we've raised on appeal, although I'm happy to answer questions related to the other, and that is the issue of intent. The only count on which Mr. Monarrez was held liable to the plaintiff was the count for intentional infliction of emotional distress. And as the precedents of this court and the Supreme Court have made absolutely clear, in order to be liable for intentional infliction of emotional distress, the defendant must either have intended the severe emotional distress or have known that there was a high likelihood that that distress would result. It's not a negligence standard or a recklessness standard. It requires a subjective view that the actions that the defendant is taking are likely to have an effect on the plaintiff or the target of the actions that will result in severe emotional distress. And the reason that none of the evidence in this case was sufficient to support that as a factual conclusion or even an inference from the evidence is that all of the evidence suggests that the last thing that the defendant intended and, in fact, the last thing that he ever even thought about was the likelihood that his teacher, who was the target of the phony MySpace page, would ever know about the MySpace page. He intentionally set it up in ways that would make it accessible only to his friends in the IB program. How many friends? He says he sent it to, he thinks, about five or six. He sent a link directly from the MySpace page to five or six students, only students who were in the IB program. And he didn't send any other emails and he didn't send it to anyone else. He did determine the next day, when other people talked to him about it, that the people to whom he had sent the link had sent it to other people. And that's when he decided that things had gotten out of hand. And as soon as he went home from school that day, he took the link down. Let's talk about the way MySpace works. I want to pick up on something that you just said. He discovered that the link that he sent to his friends had been sent to someone else. Correct. His friends had forwarded it to others. So that's possible. Yes. As opposed to, well, you could educate us, but as opposed to, for example, Facebook where someone has to be invited as a friend, I guess, to be able to access portions of a particular page? Well, the record evidence is actually sort of in between that, Your Honor. He sent a link that was the MySpace equivalent of a friend request. It said to the students to whom he sent it, IB coordinator would like you to be the MySpace equivalent of a friend. That's what they got when he sent the link. That could also be forwarded on to other people. But it was equivalent to a friend request in the sense that it looked like it was coming from the author of the page and it was an invitation to have contact. Now, it's important to note that the name... If this link could be, once you start sending things out to the Internet, you have to know that there's a substantial risk that it could be widely disseminated. So if this link that he sends to five or six friends is something that could be forwarded to other people, shouldn't we say that he knew that there was a substantial possibility that this was going to get out on to the Internet? No, Your Honor, for two reasons. One, because that's closer to a negligence or a recklessness standard that he should have known as opposed to what the standard for intent is, which is, no, there is a high probability. And two... And no, there's a high probability that a teenager sent out a disgusting note to other kids who's going to send it on? No, that they would... His thought was they might send it on. He didn't really think about that. But that's what he, if he had stopped to think about it, might have thought. But he clearly didn't think that anyone could send it to the teacher. Is it an objective or subjective analysis? Are we supposed to say, should a reasonable high school student have known that this was going to be forwarded on? Or are we just supposed to look into his mind and say, he didn't really think about it? It's his intent. He must have intended the result for him to be guilty of intentional aggression. I think we should put intent, actual intent aside and say, did he know that this was going to be, that there was a high probability that this was going to get out there? Okay, so when we say, did he know, are we saying subjectively did he know or objectively did he know? Well, two answers to that, and I think the case law is somewhat unclear because of the differences perhaps in this kind of situation. One, as we have argued, teenagers don't necessarily think the way everybody else does. Teenagers all the time send naked pictures of themselves to one of their friends, thinking their friend isn't going to send it on to anybody. Now, we all know that in that situation where the teenage girl certainly didn't intend for her picture to go viral, it happens. But you can't say that when she sent that picture, there was an intent element, meaning she should have expected that there was a reasonable likelihood that her naked picture would show up. Teenagers think differently with respect to that as well. But two, the intent here has to be measured against the intent of who would get it. It would be a different argument if the harm was alleged to have been caused from it having been forwarded at all. But the harm that's alleged came from one of the students who did get it during the less than a day that it was posted, sending it to the teacher. Because the expectation of the student when he sent it to the people that he chose to send it to was that they all had the same dislike of the teacher that he did. They would laugh at the posting, but it never would have crossed his mind that one of them would send it to somebody else who was likely to send it to the teacher. This would clearly be a very different case if the posting had been done by, say, another teacher in the school, where there was a very high probability that other teachers would have done it. Let me ask you this. So you're telling us that because this is a teenager, the teenager of course should not be responsible for his acts. Is that what you're telling us? No, absolutely not, Your Honor. I'm just saying that... Is this the type of thing that if a reasonable person saw it, they might become emotionally distressed? Absolutely, Your Honor, and we have not argued, did not argue... So he sends it to a bunch of people, and it wasn't his intention, you're telling us, that the teacher would see it. Correct. Okay, that's almost like calling my pencil an elephant, but it's still a pencil. Well, Your Honor, his thought process, and he took steps in order to try to ensure that. He didn't put the teacher's full name in it so that it couldn't be discovered by somebody simply searching for his name. He made the name of the page IB coordinator without her name in it at all, so that nobody would stumble upon it in looking for other things. And he did restrict the access so that you couldn't get it unless somebody gave you the letter. Well, didn't everyone who received it know who it was referring to? If somebody knew her, but it didn't have her first name, it didn't have the name of the school, it only had the last name, and it did have a picture. So certainly, and there's no argument that he didn't intend for the people to whom he sent it to know who the page was about because there was a picture. But again, he didn't have the intention of having it go further than the people to whom he sent it, and he didn't have the expectation that any of the people to whom he would send it would also make it known to the teacher. Did he testify to that in front of the judge? He did, Your Honor. And the judge made a credibility assessment and thought he was dishonest and lying? Well, her conclusion was the fact that he testified that he confessed to having done it was evidence that he knew the serious of the crime. And the argument is that while that may well have been evidence that he, when he found out that people knew about the page and that the teacher had found out about the page, he certainly did know at that point even more than he had known up to that point about the seriousness of the crime. But the fact that three or four days later he decided that he would come forward, acknowledge that he had been the creator, and go to the teacher and confess, doesn't support the inference that that means that he intended four days earlier for her to find out about it. And that was the only factual point that she relied on in reaching the conclusion that that was his intent. And that simply is a different inference and doesn't support the inference of intent. Well, what would you say the standard of review is with regard to that question? It's certainly clearly erroneous that there is the manifest weight of the evidence and fair inferences from the evidence supported cannot support a finding of intent. We certainly, that is the standard of review for that point. So you believe there's enough evidence here for us to find clearly erroneous? I think that there is no evidence that supports an inference of intent or knowledge of high reasonableness because of the efforts that he went through to shield the page from accidental discovery. Had he simply put the page out there with no safeguards at all, and had it been a so-called open book that anybody could have come across, then it would clearly be difficult to argue that he didn't have a reasonable basis to think it was likely that the teacher would find it. If you put her picture on there, right? You did. You don't think that that's an intent to harm, or demonstrates an intent to harm, or the judge could say that demonstrates an intent to harm this particular person with her face on it and all the terrible things that it said about her. And when he puts it on, not only with her picture and all the remarks, but on my space, knowing that whoever he sent it to can send it to somebody else. No, for the reasons that he targeted the people that he sent it very narrowly. He targeted the people who he sent the link to. Maybe he only had six friends in the Ivy program, but they have friends. But his view and his testimony was those were people who he believed felt as he did. And so his expectation was. But there's nothing in the MySpace page that tells his friends that it's his work, is it? It's a pretend page. It's supposed to be the teacher's page. So why would he expect his five friends who look at a MySpace page and see the teacher has this MySpace page, there's nothing on the page that says, don't show this to anybody else, or this is really mine, and this is a joke, and don't send it to anybody else. It's an imposter page, and there's no guarantee, once he sends it out, that those five kids aren't going to run around the school and show it to everybody. Certainly, Your Honor, that is correct. There is no guarantee. There's no safeguard at all. But he thought the safeguard was that it was clear from the page that whoever created it, it was not the teacher, that it was clear from that page. And what is there on the page that tells them not to show it to anybody? There was nothing that said don't show it. How can you say that there's safeguards? Some kid looks at this and says, oh, this is pretty funny, and he just runs around the classroom and shows it. There's nothing to stop him from showing it to 30 kids in the classroom. There's nothing to stop him from showing it to his parents, or his parents who might be looking over his shoulder when they look and see, what's our kid doing on the Internet, and then they look over the shoulder and they say, oh, look at this. We're going to the school board with this. There's nothing on that page that communicates to those five or six kids that this should go no further. So what safeguards are there? Your Honor, when we go back again to the intent, I cannot disagree and do not disagree with anything that you said. But in his mind and in evaluating what his intent was and what his thought process was when weighing the issue of whether he knew there was a high probability, he thought that it could get forwarded to other people. But he didn't think it would get forwarded to the teacher or to parents or to anybody who wouldn't think it was funny in the way he thought it was funny. Well, if Judge McWilliams felt that that was an unreasonable belief on his part, doesn't she have the right to make that credibility determination, and shouldn't her credibility determination be judged as to whether or not that was against the manifest way of the evidence? She did not do that, however. She certainly would have been able to do that, but she based her conclusion on the fact that he came forward and confessed and not on a finding that the safeguards that he put in were not reasonable or that they couldn't be supported by his own testimony. My final point would simply be to refer to the Indiana Supreme Court's decision. It wasn't a criminal case, so it is clearly a different standard, but a very similar situation where a teenager made a phony MySpace page filled with vulgar and very improper language about the principal in her school, and the Supreme Court said that the evidence couldn't support an intent when there was an equally likely possibility that that MySpace page was made in the effort of that teenager to be a hero to her friends and to be humorous in the school. So while clearly the standard of proof was different and clearly it was in the context of a criminal situation, which is very different, the absence of evidence and the possibility of a different intention that was testified to by the plaintiffs is exactly the same as in that case. I want to save some time for a moment. Thank you. Most of the discussion has gone to the intent issue up to this point, so I'm going to pass over it for the moment and perhaps discuss a few other aspects that are ancillary to it. Number one is counsel's focusing on what Monera has testified to in the course of the trial. In other words, in sort of a Perry Mason way, she suggests to this court that unless someone gets up in the courtroom and says, I did it and I intended to do it, that intent can never be proven, and we all know that that is not the case and is not the standard in the state of Illinois and probably anywhere else. We also know that the judgment of the lower court can be sustained on any basis that's supported in the record. So this court is not held to the words as drafted by the trial judge in this case, but that the case could be sustained on any other basis which you may find to support the judgment. Clearly in this case, this young man had great hate for this teacher. Anyone who does what he did and the words that he used and the statements that he made about her and what have you shows tremendous hate. In terms of his credibility, he was asked during the course of the trial whether he had any reason to dislike or harm Barnes. He said there's no hostility or bad blood of any kind between them. Would that be a credible statement given what he actually did, what he did to this woman, a single woman working in an inner city public school? Now, when I went to school, perhaps when you went to school, the atmosphere in the schools were much different. Teachers were respected. Violence was absent. I guess it all depends on where you went to school. That's correct, but you know what, Judge, in all respect, I went to school on the west side as a little kid in a pretty marginal neighborhood, and we never had those issues. But in any event, teachers did not have the fear that they have today. You know, we didn't walk through metal detectors. We weren't worried about guns and what have you. We weren't worried about rape and violence. The crux of this case is intention. It is correct. All right, so we ought to focus on that. I am, but what I'm trying to say is that, in the context of my statements, is the reaction that Ms. Barnes had to this MySpace page and the fact that she did not know who had published it created a sense of tremendous fear in her. In other words, the emotions that ran within her as a result of that are overwhelming. She doesn't know where it's coming from. She doesn't know who's doing it. You know, I think that's a given fact. The question really comes down to intention, what was in the subjective manifestation of thought process of this mind job. Staying with the intent, the subject of intent, then, Your Honor, the actions, in other words, you can deal with intent inductively, deductively, whichever way you want to attack it or whichever way you want to analyze it. But in this case, as has been discussed already, there is no, in my opinion, there is no way that anyone could say that this particular young man did not have the intent to harm this particular teacher. As has been pointed out, the dissemination of this was guaranteed. And we're also, we're not dealing with a retarded individual here. As a matter of fact, Mr. Moneris was a member of the gifted program at Curry High School. He was a part of the baccalaureate program. During the course of the trial, he admitted he's of higher intelligence and did very, very well in school. So when we take that into consideration, we can only come to one conclusion, which is that he intended to do what he did. If this is a parody or a joke, that's something that you do to a friend. You don't do this, this type of conduct you would not do to a friend. And as the Supreme Court stated in the Thornton case, which we cited in the brief, the emotional distress, the intent of the individual can be derived from the act itself. In other words, from the conduct from the act itself. In reality, what Moneris did, the only reason, and contrary to what counsel said, this page was up for approximately one week. I believe he did it on a Wednesday, and it was not taken down until a Monday. He came back to school on Monday claiming he was ill or what have you, and then spoke to a teacher. So it was that particular period of time before Ms. Barnes learned that it was, in fact, Moneris who had posted the particular page. Getting back again to the intent issue, in any case, in criminal cases, in any case, intent can be derived from the conduct, the action, the expectation. It does not have to come from the words of mouth of the defendant, because we could open up our jails then if a defendant claims that he didn't do it, and we don't have somebody to say, well, he did it, then that will empty out the jails. In the same way here, the mere fact that this young man said that he did not do it cannot overcome the facts of what he actually did, the conduct in which he engaged, the way he went about it, and the reasonable expectations that he had to have. And if we go to the element of proof on the subject, the defendant's conduct was extremely outrageous. The defendant either intended to inflict severe emotional distress or B, which is what we're dealing with, well, we could be dealing with A too, or knew that there was a high probability that his conduct would do so. And we're citing the Conigva case. And the appellant took the position this morning that the judge, the trial judge, keyed on the fact that there was testimony that he came forward and confessed because he didn't want anybody else to get in trouble. And the appellant says that the inference that you can take from that is that he came forward and confessed because he didn't want anybody else to get in trouble, and that he was therefore somewhat surprised that this had gotten out. I take that from their argument. How do you respond to that? That that's not direct evidence that he knew it was going to get out. Also, I'll give you two things. Sure. And the other thing is that in response to my questions, the appellant stated that the defendant was somewhat careful because he didn't put the teacher's name on the page so that, therefore, it wouldn't be searchable. Well, obviously, it's been pointed out already. Her photo speaks for itself. In other words, if you're disseminating this in the school, everybody could see her picture even if her name wasn't even on it. Well, I don't think that that's the point with regard to it being searchable. I think that she can correct me if I'm wrong when she gets back up. But I think what she was saying was you couldn't, for example, Google this teacher's name and find this page because the teacher's name was not on the page. I don't know that absolutely to be the fact because, for example, on Facebook you can bring up somebody's name. However, the name will come up, but you'll have to log in to get more information. So in that sense, you're right, but I don't know that to be the case. I think what happened here, based upon the testimony, is that Menares, when he created the page, and the reason that he confessed is because, by accident, when he listed this page subsequent to its creation, he listed the page. He put himself down as a friend. And if you go to the second page of the MySpace page, his photo appears. And he knew at that particular point that he was a cooked goose. It says on there, I think, circled Jose or giving, I guess, a gang-type symbol or some type of a character. He knew his goose was cooked at that particular point in time. In fact, he had no intention of fessing up to this at all until he realized that this had taken place. And so his coming forward after the fact, there could be a lot of explanations as to why he did it, but the goodness of his heart is certainly well down the line. If there are no additional questions, I'll conclude my remarks. Thank you. A very short rebuttal. Yes, Your Honor, just two quick points. One, to Justice Palmer's point, it is certainly not the case that you could have found this by Googling her name because her first name is nowhere on it. Her last name is on there. It does say Barnes in various places. But unless you looked at everything that Google popped up with Barnes, that would not have done it. And he did intentionally use IV coordinator as the page name for precisely that purpose, and that was his testimony. Secondly, I just need to address the point about when the page was taken down. His testimony was he took it down as soon as he got home from school that day, and that he didn't take it down at school because the computers at school were blocked from MySpace access. And Ms. Barnes also testified that it is correct that nobody can access MySpace at the school. In fact, she had a hard time having the tech people find the page when she first asked them. So that is his testimony. The basis for the claim that the page was taken down five days later was the fact that the teacher sent an email to MySpace asking it to be taken back and got an automated reply saying, thank you, the page is scheduled for deletion. And there's no evidence in the record at all that that meant that it wasn't going to be taken down until some other point. And there's no other evidence in the record that anybody ever saw it after the afternoon when he testified he went down and took the page down. Clearly he confessed because he found out that people beyond the group that he had intended to see the page knew about it. It is absolutely right when he created that page, he didn't intend to go into school the next day and tell people that he had done it. But the reason that he did it is because he discovered that the school officials were looking for the creator of the page. By that point, the record shows the police had been involved, the tech people had been involved for four days and had not yet determined who had done it. So it wasn't an easy thing to do. But he did decide at that point he should tell Ms. Barnes and other school officials so that no one else got in trouble. To pick up on that question I asked earlier, do you think that that leads to the inference that he was surprised? He was definitely surprised. He was surprised the next day. I mean, if you accept, on a credibility basis, if you accept that statement. Yes, he was not only surprised that the teacher had found out, but the next day before he knew that the teacher had found out, when he heard from other students that they knew about it, he was surprised that people beyond the group that he had sent it to knew about it. And that's what he testified was the reason he went home and took it down immediately. He said, I got scared. I went to school. I heard that all these people were talking about it. I thought, whoa, this is not what I intended when I did it last night. He went home and took it down immediately. We heard that as part of your argument already. You've already exhausted your time. Thank you, Your Honor. You have a busy schedule. We want to thank you for a very interesting case. You did a very good job before us, both of you, and the briefs were wonderful, and we'll take it under consideration.